**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**December 1, 2005**

Charles R. Fulbruge III
Clerk

In the United States Court of Appeals

For the Fifth Circuit

_____

No. 04-30848

_____

IN THE MATTER OF: WEST DELTA OIL COMPANY, INC.,
                          Debtor.

I.G. PETROLEUM, L.L.C.,

                                    Appellant,

                          versus

MICHAEL A. FENASCI; PERRIN BUTLER,

                                    Appellees.

_____

Appeal from the United States District Court
For the Eastern District of Louisiana
(USDC No. 2:03-CV-3330-J)

_____

Before HIGGINBOTHAM, BARKSDALE, and CLEMENT, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

    We review today an award of attorney's fees to special

counsel in a bankruptcy proceeding who allegedly acted to acquire

the assets of the debtor to the debtor's detriment.  In awarding

fees, the bankruptcy court, upheld by the district court, found

no conflict of interest.  We reverse.

                                I

    Ninety-five percent of West Delta Oil Company's shares were

held by James Ingersoll, Jr. and DKCCB Trust, in equal parts;

Donald Muller, president of West Delta, held the remaining five percent. West Delta hired as counsel Ronald J. Hof, who filed a petition for relief under Chapter 11 of the Bankruptcy Code on January 26, 1999. There was bad-blood between Muller and Ingersoll. Muller had accused Ingersoll of various acts of mismanagement and, with a voting proxy from DKCCB, voted him out of office (president and chief operating officer) eleven days before West Delta filed for bankruptcy. Ingersoll moved to dismiss the petition and, on April 6, 1999, West Delta retained Michael Fenasci and Perrin Butler as special counsel to deal with that motion and other issues relating to Ingersoll. Butler and Fenasci persuaded the bankruptcy court to deny the Motion to Dismiss.[1]

West Delta filed under Chapter 11 but made no effort to reorganize. A year later, on January 31, 2000, West Delta filed a plan to liquidate. Under the plan, all of its assets were to be transferred to Crescent Oil, an entity wholly owned by Donald Muller, in exchange for payments over a five-year period by Crescent Oil to West Delta's creditors. On February 14, an outside bidder, I.G. Petroleum ("I.G."), filed a competing liquidating plan to pay the creditors over four years in exchange for all of West Delta's assets. On February 18, 2000, a second outside bidder, Source Energy, filed a competing liquidating plan, but it was later withdrawn.

_____

[1] *See In re W. Delta Oil Co.*, No. Civ. A. 99-1995, 2000 WL 108919 (E.D. La. Jan. 28, 2000) (unpublished).

Meanwhile, the Chapter 11 proceedings intensified On February 9, 2000, Fenasci, as counsel for West Delta and its Board of Directors, by letter to David Waguespack, counsel for I.G., threatened a RICO suit and pursuit of Rule 11 sanctions for supposed allegations made in a Motion to Terminate Use of Property filed by I.G. Fenasci claimed that the motion had misrepresented West Delta's operations and financial position to creditors and wrongfully implicated Muller in mismanagement. On February 16 and 17, Butler, as counsel for West Delta and its Board of Directors, sent letters threatening legal action to persons employed by Texaco and Conoco, and allegedly working on behalf of Source Energy. The letters also inquired as to whether Texaco and Conoco were involved in efforts to take over West Delta, and whether these companies approved of their employees' actions with respect to West Delta.

On February 29, the bankruptcy court expanded Fenasci's scope of employment, authorizing him to handle certain matters pertaining to I.G. Those matters included the plan filed by I.G. to take over West Delta. Subsequently, on March 10, 2000, West Delta filed an amended plan providing for payment in full of all creditors and no payment to the equity holders. In its disclosure, West Delta described the funding mechanism for its plan as follows:

> In order to fund the Plan, West Delta has negotiated an agreement with Crescent Oil Company, Inc. (hereinafter "Crescent") to take over operations of the West Delta Field and to provide funding to pay all creditor's claims in full. Crescent presently has a line of credit with Hibernia National Bank in the amount of $960,000.00 to be used to pay all creditor's claims except the claims of

> Donald A. Muller, who has agreed to subordinate his claims to all other claims. The line of credit is secured by certificates of deposit totaling $960,000.00, which have been pledged by a group of investors. The investors will receive a working interest in the West Delta wells as consideration for the investment. Debtor estimates the total amount of claims to be paid under the plan to be approximately $800,000.00.

On March 30, I.G. amended its plan to provide that it would pay all creditors in full and would pay $400,000 in equity for West Delta's assets.

At a hearing on West Delta's disclosure statement held before the bankruptcy court on April 20, 2000, Hof declined to disclose the identity of the investors who were investing money in the new plan. Hof argued that such information was not necessary because the investors would not be officers of the reorganized company in the event that the plan was confirmed, and the creditors would all be paid in full. When pressed to point to some evidence that the line of credit at Hibernia National Bank was actually established and available, Hof noted that he did not have a written document, but he could "certainly have it" and that the bank had "agreed to it."[2]

At a deposition taken on July 14, 2000, Muller testified that he had been negotiating with Burrwood Oil to provide capital to Crescent in the form of collateral that would be used to secure a loan from Hibernia National Bank. He stated that the negotiations

---

[2] At the hearing, David Waguespack, counsel for I.G., said that he believed DKCCB Trust may be the elusive investor behind the Crescent bid.

4

were ongoing, that his contact at Burrwood Oil was a man named Chris Ezell, and that he had met no one else involved with Burrwood. He averred that during the course of negotiations, he had contacted Hibernia National Bank and been informed that Burrwood had "[a]lmost a million dollars" in an account there. When asked if Burrwood had committed to put up the money for Crescent, Muller responded that the negotiations with Burrwood were almost complete, and that a commitment would be available in time for confirmation of the plan. Muller stated that the final detail to be negotiated was the amount of working interest the investors would receive in the West Delta well.

On July 24, 2000, West Delta withdrew its plan and I.G. filed an amended plan increasing the amount to be paid in equity from $400,000 to $510,000. I.G.'s plan was confirmed on July 28, 2000. In connection with the withdrawal of the West Delta plan, Charles Rohm, the Treasurer for West Delta, sent a letter to Hof stating:

> Regarding our telephone conversation of this afternoon, be advised that the final negotiation of the terms and conditions attendant to our letter of credit have proven to be so egregious as to cause a impasse with no further chance of consummating this trade. Also, our attempts to secure additional funding have proved less successful than anticipated. Therefore, after careful study of [I.G.'s] third plan of reorganization, The Board of Directors of West Delta has decided to withdraw its plan of reorganization and fully support [I.G.'s] plan. Please advise counsel for [I.G.] and the court as soon as possible.

On September 1, 2000, Butler submitted his first application for compensation, requesting total attorney's fees in the amount of

5

$37,002 for services rendered to West Delta from March 15, 1999 to June 27, 2000.[3]  Fenasci filed his second application for compensation on the same day, requesting attorney's fees in the amount of $38,369 for services rendered from February 8, 2000 through July 13, 2000.  Fenasci had filed his first application for compensation on February 7, 2000, in which he claimed $34,465.50 in attorney's fees for services provided to West Delta from March 15, 1999 through January 24, 2000.  Butler's billing statement indicated that his work focused on opposing Ingersoll's Motion to Dismiss; dealing with a creditor's claim by Marvin's Engine; and opposing Ingersoll's Motion to Appoint a Trustee in place of the debtor.  Fenasci's billing statements indicated that his work centered on opposing a Motion to Terminate Use of Property of Estate Out of Ordinary Course of Business; opposing the Motion to Appoint Trustee; opposing the Motion to Dismiss; and dealing with a creditor's claim by Marvin's Engine.

I.G. filed objections to the applications for compensation, grounding its argument in part on its discovery that Butler and Fenasci were two of the investors behind Burrwood Oil.  At his deposition, which was introduced into evidence at the bankruptcy court's September 22, 2000 hearing on the applications, Butler claimed that sometime in May, April, or June of 1999, he floated

---

[3] Earlier, on February 17, 2000, the bankruptcy court had imposed a March 30, 2000 deadline for all administrative claims to be filed.

the idea of putting up money as a passive investor in order to help Muller secure financing for Crescent. He claimed that no documents were ever signed, and that he just wanted to "be there as insurance" if Muller needed him in order to go forward with the plan. Nonetheless, Butler and Fenasci hired Robert Haik, a lawyer, to negotiate with Muller and then employed a second negotiator, Chris Ezell, who Muller later said was his contact at Burrwood Oil, when Haik fell ill. He also met with a Hibernia National Bank officer and inquired as to whether a pledge of an unencumbered piece of property worth $500,000 would be sufficient as security for a proposed loan to Crescent. He was informed that such a pledge would be sufficient.

In his deposition, also offered into evidence at the September 22 hearing, Fenasci denied the existence of any signed documents evidencing an agreement between Burrwood and Crescent. He alleged that no agreements were ever reached to post collateral or assist in the provision of financing. Fenasci did state that he was part of a "loose association" of people who were "merely waiting" and ready should an offer to deal be extended. He asserted that he had no role in the negotiation of terms, as this was handled entirely by Haik and Ezell. He claimed that the negotiations were "all talk" and that no deal was ever made. He asserted that no certificates of deposit were pledged in conjunction with the West Delta Plan. He did concede that there was a bank account at Hibernia National Bank in the name of Burrwood, which was the name

7

used by the "loose association" of people, and that he had $150,000 on deposit with the bank.  He related that Butler discussed pledging a $500,000 piece of unencumbered property.  However, no pledge was ever made because West Delta never applied for the loan, and no agreement for financing was ever reached.

At the hearing on the applications held on September 22, 2000 before the bankruptcy court, Hof claimed that he did not know who the Burrwood investors were, at least not at the time the hearing on the disclosures was held.  He testified that he included in the West Delta disclosure the statement that "Crescent had a line of credit for $960,000" based on information provided by West Delta management.  He also stated with respect to West Delta's plan to liquidate to Crescent:

> The only thing that had to be worked out was the terms and conditions with the [Burrwood] investors. Basically, there was [sic] investors putting up collateral to support the Hibernia line of credit to Crescent.  And that agreement between the investors and Crescent is what eventually broke down before confirmation and caused us to withdraw our plan and support the [I.G.] plan.

On March 8, 2001, the bankruptcy court entered an order holding that Fenasci and Butler's failure to disclose their participation in Burrwood did not warrant rejection of their fee applications.  The court recounted that

> [a]t one time, Burrwood Oil company was negotiating to provide collateral to secure a loan to West Delta.  Mr. Fenasci and Mr. Butler agreed, at some time that cannot be fixed with any degree of accuracy, to participate as passive investors with other investors in Burrwood Oil. If called upon to save the debtor from ceasing operations

8

as a result of a failure to file a plan, Burrwood Oil would have posted collateral so that Crescent Oil could obtain a line of credit of $960,000 to fund the debtor's plan of reorganization as described in the debtor's disclosure statement. These negotiations, however, never came to fruition. Both Mr. Fenasci and Mr. Butler testified unequivocally that no agreement ever existed between them and Burrwood Oil, that they never signed anything, never pledged any collateral at the bank, and never acquired an interest in Crescent Oil. The disclosure statement probably should have disclosed the possible participation of Mr. Fenasci and Mr. Butler, and it certainly would have had to have been disclosed at any confirmation hearing on the debtor's plan of reorganization.[4]

The court concluded that this failure to disclose could be excused for three reasons:

(1) the tentative plans by Mr. Fenasci and Mr. Butler were never reduced to any firm agreement;

(2) the debtor's plan (and any participation by Burrwood Oil and/or Crescent Oil) never came on for confirmation; and

(3) Mr. Fenasci and Mr. Butler are unfamiliar with bankruptcy law.[5]

The court denied Fenasci's and Butler's applications for fees earned after March 30, 2000 because of their failure to disclose pre-petition claims against West Delta in a timely fashion. The court then granted Fenasci's first fee application in full and granted him $8,075.25 on his second fee application. The court denied Butler's application without prejudice to allow him to attach a list sufficiently detailing the services (and dates of

---

[4] *In re W. Delta Oil Co.*, No. 99-10406, at 6-7 (Bankr. E.D. La. Mar. 8, 2001) (unpublished order).

[5] *Id.* at 7-8.

those services) that he provided.  Upon rehearing, the bankruptcy court granted Butler's application for fees incurred before March 30, 2000.

I.G. appealed, and the United States District Court for the Eastern District of Louisiana dismissed the appeal as premature.[6] After the bankruptcy court clarified that its order granting fees was final and appealable, the district court granted I.G.'s motion for reconsideration.  On March 28, 2002, the district court held that the bankruptcy court abused its discretion by granting untimely fee applications without applying the appropriate legal standard for deciding whether there was cause or excusable neglect. In addition, the district court held that the bankruptcy court failed to inquire properly as to whether Butler and Fenasci's participation in Burrwood gave rise to a possible "adverse interest" to West Delta.[7]  The court reversed and remanded for further consideration.

On remand, the bankruptcy court first applied the factors set forth by the Supreme Court in *Pioneer Investment Services Co. v. Brunswick Associates Limited Partnership*[8] and determined that Butler's and Fenasci's fee applications were granted properly under

---

[6] *See W. Delta Oil Co. v. Hof*, No. Civ. A. 01-1163, 2001 WL 1456863 (E.D. La. Nov. 14, 2001) (unpublished).

[7] *W. Delta Oil Co. v. Hof*, No. Civ. 01-1163, 2002 WL 506814, at *8 (E.D. La. Mar. 28, 2002) (unpublished).

[8] 507 U.S. 380 (1993).

the excusable neglect standard.[9]  The court then turned to examine whether Butler and Fenasci's involvement with Burrwood and failure to disclose that involvement warranted denial of their fees.  The court first determined that Butler and Fenasci's failure to disclose their involvement with Burrwood constituted a violation of Federal Rule of Bankruptcy Procedure 2014(a), requiring an attorney employed under 11 U.S.C. § 327 to file a verified statement disclosing his "connections with the debtor, creditors," and "any other party in interest."  The court found that this failure to disclose did not warrant denial of fees, however, because even if Butler and Fenasci had disclosed their involvement with Burrwood, the court would have found that this involvement was not adverse to the West Delta estate.

The court observed that under § 327(e), "an attorney may represent the debtor in bankruptcy proceedings for a specified limited purpose, if it is in the best interest of the estate, and if 'such attorney does not represent or hold any interest adverse to the debtor or to the estate with respect to the matter on which such attorney is to be employed.'"[10]  The court then noted that great latitude is allowed "'in assessing conflict of interest

_____

[9] *See In re W. Delta Oil Co.*, No. 99-10406, at 5-20 (Bankr. E.D. La. Oct. 7, 2003) (unpublished).

[10] *Id.* at 24 (quoting 11 U.S.C. § 327(e)) (footnote omitted).

11

qualifications'" under § 327(e),[11] and opined that "for purposes of determining the qualification of an applicant under § 328(e), the court only considers whether an applicant's interest is 'adverse' with respect to '*the matter on which such attorney is to be employed*.'"[12]

Turning to the scope of Butler and Fenasci's representation of West Delta, the court determined that their defense against Ingersoll's Motion to Dismiss was unrelated to their interest in Burrwood. Further, the court found that even if the matters were sufficiently related to merit a "broader inquiry," there was little evidence connecting Butler and Fenasci to Burrwood. Finally, the court noted that Butler and Fenasci's defense against the motion actually benefitted the bankruptcy estate. The court next found that although Fenasci's representation of West Delta in a matter relating to I.G. presented a "potential conflict of interest," the contingent and preliminary nature of Burrwood's existence never gave rise to an "actual conflict" or an "adverse interest."[13]

The court concluded that any adverse interest generated by Butler and Fenasci's involvement with Burrwood was directed at I.G., not the bankruptcy estate. Based on these determinations,

---

[11] *Id.* at 26 (quoting *In re Henlar, Ltd.*, No. 96-2374, 1997 WL 4567, at *3 (E.D. La. Jan. 6, 1997)).

[12] *Id.* (quoting 11 U.S.C. § 327(e)) (emphasis added in *In re W. Delta Oil Co.*).

[13] *Id.* at 28.

12

the court held that, in its discretion, the fee applications of Butler and Fenasci would be granted. I.G. appealed this order to the district court, which affirmed.[14] The court found that even if the Burrwood negotiations were more than preliminary and an actual conflict existed, these facts would not have compelled the bankruptcy court to deny fees. Accordingly, the district court held that the bankruptcy court did not abuse its discretion when it granted Butler's and Fenasci's fee applications. I.G. timely appealed this decision.

II

On appeal, I.G. argues that the bankruptcy and district courts abused their discretion in determining that Butler and Fenasci's involvement with Burrwood and failure to disclose such involvement did not warrant denial or reduction of their attorney's fees. In addition, I.G. contends that the bankruptcy and district courts erred as a matter of law in granting Butler's and Fenasci's untimely filed fee applications. Because we conclude that the bankruptcy court abused its discretion in excusing Butler and Fenasci's conflict of interest, we need not reach I.G.'s second contention.

We review a decision of the district court affirming a decision of the bankruptcy court "by applying the same standards of

_____

[14] *W. Delta Oil Co. v. Fenasci*, No. Civ. A. 03-0330, 2004 WL 1770110 (E.D. La. Aug. 6, 2004).

13

review to the bankruptcy court's findings of fact and conclusions of law as applied by the district court."[15]  To this effect, we review a bankruptcy court's determination of attorney's fees for abuse of discretion.[16]  Specific findings of fact supporting the award are reviewed for clear error, and conclusions of law are reviewed *de novo*.[17]

As we have already discussed, 11 U.S.C. § 327(e) provides for the employment of counsel by a bankruptcy trustee for "a specified special purpose."[18]  Counsel employed under this subsection must "not represent or hold any interest adverse to the debtor or to the estate with respect to the matter on which such attorney is to be employed."[19]  A court may deny compensation for services provided by an attorney who holds such an adverse interest.

We have observed that these standards are "strict" and that attorneys engaged in the conduct of a bankruptcy case "should be free of the slightest personal interest which might be reflected in their decisions concerning matters of the debtor's estate or which might impair the high degree of impartiality and detached judgment

_____

[15] *In re Crowell*, 138 F.3d 1031, 1033 (5th Cir. 1998).

[16] *See In re Barron*, 325 F.3d 690, 692 (5th Cir. 2003).

[17] *Id.; see In re Tex. Securities, Inc.*, 218 F.3d 443, 445 (5th Cir. 2000); *In re Fender*, 12 F.3d 480, 487 (5th Cir. 1994).

[18] 11 U.S.C. § 327(e).

[19] *Id.*

expected of them during the course of administration."[20] Accordingly, we are "sensitive to preventing conflicts of interest" and require a "'painstaking analysis of the facts and precise application of precedent'" when inquiring into alleged conflicts.[21] If an actual conflict of interest is present, "no more need be shown . . . to support a denial of compensation."[22]

In addition, Federal Rule of Bankruptcy Procedure 2014(a) requires any professional applying for employment to set forth "to the best of the applicant's knowledge" all known connections of the applicant with the "debtor, creditors, or any other party in interest, their respective attorneys and accountants, the United

---

[20] *In re Consolidated Bancshares, Inc.*, 785 F.2d 1249, 1256 & n.6 (5th Cir. 1986) (internal quotation marks and citations omitted).

[21] *Id.* (quoting *Brennan's v. Brennan's Restaurant, Inc.*, 590 F.2d 168, 173–74 (5th Cir. 1979)).

[22] *Id.* (quoting *Woods v. City Nat'l Bank & Trust Co. of Chicago*, 312 U.S. 262, 268 (1940)). Two of our sister circuits have expressed a preference for denying fees in the event that bankruptcy counsel is found to labor under a conflict of interest. *See In re Prince*, 40 F.3d 356, 360 (11th Cir. 1994) ("When injury to the debtor's estate occurs . . . denial of fees is proper."); *Gray v. English*, 30 F.3d 1319, 1324 (10th Cir. 1994) ("In exercising the discretion granted by the statute we think the court should lean strongly toward denial of fees, and if the past benefit to the wrongdoer fiduciary can be quantified, to require disgorgement of compensation previously paid that fiduciary even before the conflict arose."). This preference was couched in terms of the bankruptcy court's equitable power to deny fees in *In re Watson Seafood & Poultry Co.*:

> There are compelling reasons for denying all fees when a conflict of interest is present. Nevertheless, because the bankruptcy court is a court of equity, the bankruptcy judge should not be bound by a completely inflexible rule mandating denial of all fees in all cases. The general rule should be that all fees are denied when a conflict is present, but the court should have the ability to deviate from that rule in those cases where the need for attorney discipline is outweighed by the equities of the case.

40 B.R. 436, 440 (Bankr. D.N.C. 1984).

States trustee, or any person employed in the office of the United States trustee." Although this provision does not explicitly require ongoing disclosure, "case law has uniformly held that under Rule 2014(a), (1) full disclosure is a continuing responsibility, and (2) an attorney is under a duty to promptly notify the court if any potential for conflict arises."[23] "Though this provision allows the fox to guard the proverbial hen house, counsel who fail to disclose timely and completely their connections proceed at their own risk because failure to disclose is sufficient grounds to revoke an employment order and deny compensation."[24]

With this backdrop, we now proceed to examine whether, given Butler and Fenasci's involvement with Burrwood, they were "disinterested" in the bankruptcy proceedings or had an interest "adverse" to the bankruptcy estate.

The Bankruptcy Code defines "disinterested person" as a person who "does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to,

---

[23] *In re Metropolitan Environmental, Inc.*, 293 B.R. 871, 887 (Bankr. N.D. Ohio 2003) (collecting cases).

[24] *In re Crivello*, 134 F.3d 831, 836 (7th Cir. 1998); *see Rome v. Braunstein*, 19 F.3d 54, 59-60 (1st Cir. 1994) ("[A]s soon as counsel acquires even a constructive knowledge reasonably suggesting an actual or potential conflict, a bankruptcy court ruling should be obtained. . . . Absent the spontaneous, timely and complete disclosure required by section 327(a) and [Rule] 2014(a), court-appointed counsel proceed *at their own risk*." (internal citations omitted)).

16

connection with, or interest in, the debtor."[25] The Bankruptcy Code does not define the phrase "represent or hold any interest adverse to the debtor or to the estate," and our court has not had occasion to elaborate upon it. In *In re Roberts*, the United States Bankruptcy Court for the District of Utah determined that the nearly identical phrase in § 327(a) meant:

(1) to possess or assert any economic interest that would tend to lessen the value of the bankruptcy estate or that would create either an actual or potential dispute in which the estate is a rival claimant; or

(2) to possess a predisposition under circumstances that render such a bias against the estate.[26]

This definition has been employed by at least two circuit courts, as well as a number of district and bankruptcy courts.[27] While helpful, this definition must be employed with an eye to the specific facts of each case, and with attention to circumstances which may impair a professional's ability to offer impartial, disinterested advice to his or her client.[28] Thus, both definitions

---

[25] 11 U.S.C. § 101(14)(e).

[26] 46 B.R. 815, 827 (Bankr. D. Utah 1985), *aff'd in relevant part and rev'd and remanded in part on other grounds*, 75 B.R. 402 (D. Utah 1987).

[27] *See In re AroChem Corp.*, 176 F.3d 610, 623 (2d Cir. 1999); *In re Crivello*, 134 F.3d at 835; *see also In re Perry*, 194 B.R. 875, 878-79 (E.D. Cal. 1996); *In re Caldor*, 193 B.R. 165, 171 (Bankr. S.D.N.Y. 1996); *In re Red Lion, Inc.*, 166 B.R. 296, 298 (S.D. Tex. 1994); *In re Lee*, 94 B.R. 172, 177 (Bankr. C.D. Cal. 1988).

[28] *See* Louisiana Rules of Professional Conduct 1.7, 1.8 (2004 ed.); *In re Prince*, 40 F.3d at 360 ("The accurate measure of prejudice . . . is not what [the attorney] actually did or did not do in handling [the debtor's] case, but rather whether [the attorney] could have unbiasedly made decisions in the best interest of the client.").

17

have as their critical element the presence of an "adverse interest."

Turning to the facts here, we have little difficulty reaching the conclusion that Butler and Fenasci's involvement with Burrwood implicated their duty to report under Rule 2014(a) and constituted a potential conflict with their client's best interests. A lawyer who simultaneously represents a debtor in a bankruptcy proceeding and seeks to acquire a financial interest in the debtor faces myriad quandaries, particularly in the liquidation context. In essence, the lawyer is representing a seller (the debtor) and a buyer (himself). Efforts to preserve and enhance the value of the seller's assets will work inevitably against the buyer's interest in purchasing at the lowest price possible. In addition, efforts to market the seller to other potential bidders may drive up the price, forcing buyers to increase their bids. Moreover, opting to reorganize rather than liquidate may reduce or eliminate possible avenues for anyone wishing to acquire specific economic interests. In short, by operating as a potential buyer, a lawyer for a bankruptcy estate possesses a predisposition to reduce the price of the estate's assets which works to the detriment of the estate, its creditors, and its equity stakeholders.[29]

---

[29] The bankruptcy court stated that the Bankruptcy Code is "not primarily or even necessarily concerned with the protection or payment of the equity interest in the debtor." *See In re W. Delta Oil Co.*, No. 99-10406, at 28-30 (Bankr. E.D. La. Oct. 7, 2003) (unpublished). At the same time, however, the court seemed to distinguish the new equity owner (I.G.) from the old equity owners (the shareholders of West Delta), presumably because the latter were protected by the Bankruptcy Code. Whatever the court's holding, it is clear that

18

We find no merit in Butler and Fenasci's contention that they possessed no interest adverse to West Delta because their involvement with an inchoate entity composed of loosely affiliated investors was merely preliminary in nature. While they failed in their effort to acquire an interest in West Delta, this failure was not for lack of effort. Specifically, they hired not one but *two agents* to negotiate terms with Crescent. They actively made preparations to collateralize the loan by engaging in discussions with Hibernia National Bank officers, depositing monies, and inquiring as to the propriety of pledging real property. When pressed as to his source of funding prior to West Delta's withdrawal of its plan, Muller testified that his negotiations with Burrwood were nearly complete, with only the question of the size of the royalty interest left to be resolved. When West Delta finally withdrew its plan, its treasurer cited as the reason Burrwood's egregious demands. Throughout this process, Butler and Fenasci failed to disclose their participation in Burrwood to the court or to their client. Regardless of whether they were involved actively in the negotiation of terms or drafting of the West Delta plan, Butler and Fenasci had a live interest in play right up to the point at which the bankruptcy court confirmed the I.G. plan.

---

the Bankruptcy Code protects the equity holders of debtors, even though creditors are paid first. Here, because under all of the proposed liquidation plans all of the creditors were to have been paid fully, the bankruptcy court should have been concerned with maximizing the payment to the equity holders. Thus, a reduction in price of the estate would improperly harm West Delta's equity stakeholders - Ingersoll, DKCCB, and Muller.

The bankruptcy court's determination that there was little evidence to connect Butler and Fenasci to Burrwood, and that this interest was so contingent as to constitute no interest at all, ignores the reality that both Butler and Fenasci testified to taking affirmative steps in an effort to acquire a valuable financial stake in their client. The ultimate *success* of these efforts is irrelevant--the *active pursuit* of success is sufficient to give rise to an adverse interest here. The bankruptcy court's determination to the contrary was clearly erroneous.

Nor can we accept Butler and Fenasci's contention that, given the supposed narrow scope of their engagement by West Delta, their involvement with Burrwood was not adverse to West Delta's discrete interests. As we have noted, special counsel employed under § 327(e) need only avoid possessing interests "adverse to the debtor or to the estate *with respect to the matter on which such attorney is to be employed*."[30] As we have recounted, Butler and Fenasci represented West Delta in opposing a motion to dismiss and a motion to appoint a trustee filed by Ingersoll. But they did more that cannot be viewed properly as beyond the scope of their engagement or a different "matter." After working on these motions, Butler and Fenasci, purporting to represent West Delta, wrote letters to potential bidders threatening legal action, including Rule 11 sanctions and RICO. In essence, the lawyers were hampering a

---

[30] 11 U.S.C. § 327(e) (emphasis added).

process - competitive bidding - designed to help the estate while enhancing their investment opportunity. These later actions redefined the scope of their employment as representation of West Delta in the general liquidation process;[31] and their interests there were clearly adverse to those of West Delta. Moreover, such redefinition of scope was made manifest in Fenasci's case when the court expanded his engagement to include representation of matters relating to I.G.; it can hardly be gainsaid that the "matter" on which Fenasci was employed included his clandestine efforts to acquire a stake in West Delta, and at a discount, since Burrwood/Crescent offered substantially less money than I.G.

We conclude that Butler and Fenasci were obligated to report their involvement in Burrwood to the bankruptcy court pursuant to Rule 2014(a). We also conclude that their interest in acquiring a financial stake in West Delta through Burrwood was adverse to West Delta. It created incentives to lessen the value of the bankruptcy estate, incentives that were acted upon when they attempted to chill the bidding process for the assets.

We hold that the bankruptcy court abused its discretion in awarding fees to Butler and Fenasci. Butler and Fenasci had an interest adverse to that of the estate with respect to matters on which they were employed, and in their efforts to promote that interest they violated their duty to their client. There are

_____

[31] Indeed, Butler's and Fenasci's original applications for fees claimed time spent in these later actions.

21

sufficient grounds on which to deny attorney's fees.[32]  The bankruptcy court's exercise of discretion was flawed by legal error – the conclusion that Butler and Fenasci had *no* interest adverse to that of the estate with respect to matters on which they were employed.  The court, had it viewed the conflict properly, should not have allowed attorney's fees to Butler or Fenasci.

## III

The judgment of the district court awarding attorney's fees is REVERSED.

---

[32] It is irrelevant that no evidence exists pointing to actual prejudice to the estate.  As the Supreme Court has made perfectly clear, such evidence is not required because of difficulty of proof and because the problem is not just "actual evil results" but the "tendency to evil in other cases."  Woods v. City Nat'l Bank & Trust Co., 312 U.S. 262, 268 (1940).